IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

MIDDLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL CASE |
| v | : | |
| | : | No. 4:23-CR-21 (CLM)(SGC) |
| MARCUS SPANEVELO | : | |
| _____ | : | |

DEFENDANT'S RESPONSE TO GOVERNMENT'S
MOTION FOR TRIAL DATE

Comes now, MARCUS SPANEVELO, Defendant in the above-styled action, by and through undersigned counsel and moves this Court to reject the government's proposed scheduling order and instead, address scheduling after deciding Defendant's Motion to Strike the Death Notice (hereinafter, "Motion to Strike").  Mr. Spanevelo further requests this Court enter an order making the Motion to Strike due on or before January 5, 2026.  In support of this Motion, Mr. Spanevelo shows as follows:

(1)

On January 25, 2023, a Grand Jury sitting in the Northen District of Alabama returned a single count indictment charging Mr. Spanevelo with kidnapping resulting in a death in violation of 18 U.S.C. §1201(a)(1).

1

(2)

The death penalty is a possible sentence if convicted of kidnapping resulting in death.  *See* 18 U.S.C. §1201(a).

(3)

On January 26, 2023, this Court entered an order granting the government's Motion for Writ of Habeas Corpus ad Prosequendum, ordering that Mr. Spanevelo, who was then in the custody of the St. Clair County, Alabama, Sheriff's Office, to be brought before the Court for an arraignment.  (Doc. 3 & 4)

(4)

Also on January 26, 2023, the Court entered an order appointing the Federal Public Defender to represent Mr. Spanevelo.  (Doc. 5).

(5)

On February 9, 2023, Ms. Spanevelo was arraigned on the instant indictment.

(6)

On February 13, 2023, this Court entered an order setting deadlines for the filing of certain motions and responses, etc.  (Doc. 10).

(7)

On February 27, 2023, the government filed a notice indicating it would not seek the death penalty.  (Doc. 12).

(8)

The Federal Defender developed a conflict and on November 9, 2023, filed a motion to withdraw which was granted on November 13, 2023.  (Doc. 24 & 27).

(9)

On November 15, 2023, attorney Lisa Ivey was appointed and entered a notice of appearance on November 16, 2023.

(10)

On December 18, 2024, this Court entered an order setting Mr. Spanevelo's trial for April 28, 2025.

(11)

In mid-February, the government notified Ms. Ivey that the Department of Justice (DOJ) would review the previous administration's authorization not to seek the death penalty for capital-eligible defendants who had not commenced trial or suffered conviction.

(12)

Faced with this new development, Ms. Ivey, on February 24, 2025, filed a motion for appointment of learned counsel and motion to continue.  (Doc. 49).

(13)

On March 10, 2025, this Court appointed Mr. Ertel as learned counsel, continued the trial.  (Doc. 50).

(14)

On July 24, 2025, Counsel for Mr. Spanevelo made their presentation to the DOJ's Capital Case Review Committee (CCRC).

(15)

On September 16, 2025, the government obtained a superseding indictment containing a "Notice of Special Findings." (Doc. 77).

(16)

On October 5, 2025, the government reversed its prior position and filed a Notice of Intent to Seek the Death Penalty. (Doc. 79).

(17)

On October 30, 2025, this Court conducted a status conference wherein a discussion concerning a potential trial date was discussed.

(18)

Counsel for the government transmitted a proposed scheduling order to undersigned counsel, who was in the middle of a six-week jury trial.

(19)

After discussion, undersigned counsel and counsel for the government could not agree on a joint scheduling order and the government submitted a motion to set trial date, attaching a proposed scheduling order. (Doc. 93).

4

(20)

Mr. Spanevelo suggests that scheduling based on the premise that this is going to remain a death penalty case would be premature.

(21)

Mr. Spanevelo anticipates filing a Motion to Strike the Government's Notice of Intent to Seek the Death Penalty.

ARGUMENT AND AUTHORITY

This Court is vested with broad authority to manage its docket.  *See*, *Smith v. Psychiatric Sols., Inc.*, 750 F. 3d 1253, 1262 (11th Cir. 2014); *Young v. City of Palm Bay, Fla.*, 358 F. 3d 859, 863-64 (11th Cir. 2004); *United States v. Burns*, 2019 U.S. App. LEXIS 10645 at *2 (11th Cir. 2019).  That "authority includes broad discretion in deciding how best to manage the cases before them." *United Stats v. Smith*, 750 F. 3d at 1262.  A well thought out schedule will serve to save judicial resources that are already stretched thin.  *See*, *e.g.*, *Novu v Percival*, 2012 U.S. Dist. LEXIS 201706 at *20 (N.D. GA 2021).

While the government has filed its Notice of Intent to Seek the Death Penalty that does not mean that this will ultimately proceed as a death penalty case. It is Mr. Spanevelo's position that this Court has the authority to strike that notice. Indeed, it appears that in five cases (six defendants), the Courts have done just that. From counsel's research, it appears that in all five of the cases that have challenged

the current administration's decision to reverse a prior decision not to seek the death penalty, each Court has granted the defendants'' motions to strike. *See*, *United States v. Wilson Constznza-Galdomez*, 1:22-CR-00409 (D. MD); *United States v. Richardson Dangleben*, 3:23-CR-00072 (D. VI); *United States v. Enock Cole & Jiovoni Smith*, 1:23-CR-00016 (D. VI); *United States v. Cory Spurlock*, 3:23-CR-00022 (D. NV); and *United States v. Monroe Merrill*, 3:20-CR-00046 (D. WV).[1]

Mr. Spanevelo suggests that this Court address his Motion to Strike the Death Notice before entering a scheduling order. If this Court, like all of the other courts, decides to strike the death notice, a trial can be scheduled in short order.[2] If, on the other hand, the Court decides not to strike the death notice, a scheduling order can be put in place that allows for the parties to submit motions, respond and reply and allow the Court ample time to render well-reasoned decisions.

Mr. Spanevelo requests this Court set January 5, 2026, as the due date for the Motion to Strike the Notice of Intent to Seek the Death Penalty. Thereafter, the government would have thirty days to respond, and Mr. Spanevelo fourteen days to

---

[1] *United States v. Richardson Dangleben* is scheduled to be argued on an interlocutory appeal before the Third Circuit Court of Appeals December 9, 2025.

[2] Indeed, prior to the announcement that DOJ would reconsider the decision not to seek the death penalty, the case was scheduled to be tried within two months.

reply. Thereafter, the Court will issue an order which will provide clarity on how the parties should proceed.

### The Government's Assertions

Mr. Spanevelo does not disagree with the government that a scheduling order is appropriate. Indeed, Mr. Spanevelo will advocate for one at the appropriate time. The appropriate time, however, is when the parties and this Court know what type of trial, capital or non-capital, they will be scheduling.

The government asserts the Court should adopt the proposed scheduling order to protect the rights of the victims. (*Id*. at 5). The victims' rights will be vindicated by conducting this process in a deliberate, well-reasoned manner. It is in the victims' interest that this trial be conducted properly with the rights of the Defendant and the government fully protected. The brief delay in deciding the Motion to Strike would not infringe on the victims' nor the public's rights. In fact, resolving the Motion to Strike may actually bring this case to fruition in a much shorter time.

The government also asserts its scheduling order provides sufficient time for the Defense to prepare.[3] In so arguing, the government asserts "this time schedule

---

[3] The government, in part, bases this conclusion on the mistaken belief that counsel for Mr. Spanevelo was given meaningful access to the discovery in a timely manner. The government provided discovery in May of 2025, and then again in June. However, the defense was unable to access a large portion of the discovery

is generally consistent with the average timeline in federal death penalty cases." (Doc. 93 at 9). However, this is not an average death penalty case as Mr. Spanevelo, although born in the United States, spent the majority of his life in Brazil and the majority of his family and friends still reside there. Given the remoteness of these potential mitigation witnesses and the cultural and language differences, the mitigation investigation, in this case, will not be "average." *See infra*.

### The Need to Conduct a Thorough Mitigation Investigation

As the Court is aware, it is Counsel's duty to conduct a thorough mitigation investigation. *See Williams v. Taylor*, 529 U.S. 362, 396 (2000) (ineffective assistance where capital counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background). In *Williams,* writing for the Court's majority, Justice Stevens cited the American Bar Associations STANDARDS FOR CRIMINAL JUSTICE (2d ed. 1980) concerning the need to investigate sentencing issues thoroughly. *Id*. at 396. Standard 4.4-1 of the Defense Function stated: "[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case *and the penalty in the event of conviction*." *Id*. at 453

---

provided. Ultimately, a new hard drive had to be provided, and the defense was finally able to access all of the discovery in September of 2025.

(emphasis added). In discussing mitigation, the Commentary continued, "[i]nformation concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself." *Id*. at 455.

The need to investigate mental illness as mitigating evidence is also well established. *See Ake v. Oklahoma*, 470 U.S. 68, 80 (1985) (due process right to psychiatric assistance when mental condition is relevant to culpability *or punishment*). The United States Supreme Court has mandated individualized sentencing in death penalty cases since 1976. *See Gregg v. Georgia*, 428 U.S. 153, 156 (1976) (finding Georgia's death penalty statute constitutional in part because it allowed for mercy based on individualized consideration); *Woodson v. North Carolina*, 428 U.S. 280, 301 (1976) (finding mandatory death penalty statute unconstitutional because it allowed the blind infliction of the death penalty on members of a faceless undifferentiated mass).

Effective capital defense throughout the post-*Furman* era has required counsel to conduct a thorough investigation of the client's life. The investigation of his family relationships, especially during the developmental years, is a critical part of this inquiry. This investigation generally involves a multigenerational inquiry into the biological, psychological, and social influences on the development and

9

adult functioning of the accused. Mitigation investigation involves parallel tracks of collecting and analyzing life-history records, and conducting *multiple*, in-person, face-to-face interviews. The purpose of this thorough investigation is to develop evidence that will allow the decision-maker to consider circumstances of the defendant's upbringing and his or her particular frailties in order to make a sound decision on whether a death sentence is appropriate.

The social history investigation is the foundation of a reliable capital mental health assessment. It enables counsel to make informed decisions about what expert(s) may be required and what referral questions experts should address. It is critical to conduct a thorough social history investigation before the three defendants' counsel complete their assessment of any mental health or cognitive vulnerabilities relevant to sentencing. As two experts have noted,

> The mitigation specialist is required to seek and analyze copies of every record relating to mitigating circumstances and rebutting the prosecution's case in aggravation. This means gathering all documents, including photographs, videos, and memorabilia, related to the defendant. While there is no checklist, this includes records related to births and deaths in the family, school (particularly special education), religious training, participation in sports and recreation, medical and mental health history and treatment, substance abuse history and treatment, psychological evaluations and treatment, social services, juvenile and adult criminal charges, military service, incarceration, immigration, and toxic environmental factors. Collection and analysis of life history records often confirm the recollections of witnesses as well as point to additional witnesses to interview.

Richard G. Dudley, Jr., & Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963, 971 (2008).

It is critical to gather as much documentary information as possible to conduct in-depth interviews with witnesses. The defense here will have to overcome extraordinary obstacles in their effort to obtain documentary evidence of any multigenerational mental health issues on either side of the defendants' families in Brazil, as well as any records relating to the birth, perinatal development, childhood, adolescence, and adult functioning. Records in Brazil are sparse compared to the typical life-history documentation of individuals in the United States, but it is nonetheless critical to obtain whatever is available, including, but not limited to, records about the physical environment, social and economic factors prompting these defendants to emigrate to the United States, and exposure to traumatic violence in the communities in which they spent their formative years.

Mitigation investigation is particularly complex when the client does not share the attorney's cultural background.[4] It is easy to overlook symptoms of impairment, attributing them to language difficulties or cultural differences.

---

[4]*See* Scharlette Holdman & Christopher Seeds, *Cultural Competency in Capital Mitigation,* 36 Hofstra L. Rev. 883 (2008).

Cultural issues may involve not only race and ethnicity, but sexual orientation, gender, socioeconomic status, or any other characteristics that define social identity. The process of compiling an accurate social history is more time-consuming and delicate when interviewing clients and family members from foreign cultures because of inevitable cultural misunderstandings about the nature of the legal process and the purpose of the investigation. Every aspect of the investigation is more difficult in foreign countries, from gathering records to gaining the trust and cooperation of family members and other witnesses. Records often do not exist, and when they do exist, they are harder to obtain. Cultural differences make interviews more complicated generally, and mitigation interviews are particularly difficult because the whole idea of mitigating evidence may have no counterpart in the country where the client was born.[5]

Assuming *arguendo* the Court denies the Motion to Strike, 16 months, as suggested by the government, is not sufficient time for Mr. Spanevelo's defense team to gather pertinent records, locate and interview witnesses, and conduct the constitutionally required thorough mitigation investigation in a foreign country.[6]

---

[5] The defense's mitigation investigation was further hampered by the government shut down during which experts could not work.

[6] In addition, before any mental health evaluation can be conducted counsel must ensure that sufficient investigation has been conducted so that any mental health professional they retain has all the pertinent information necessary to render a competent opinion.

Although this case has been pending for three years, learned counsel has only been involved for eight months and the experts necessary to conduct the mitigation investigation the Constitution requires, have been involved for an even shorter period of time.

WHEREFORE, this Court should postpone imposing a scheduling order until the Motion to Strike is resolved. Further, this Court should enter an order setting a due date of January 5, 2026, for the filing of the Motion to Strike.

Dated, this the 8th day of December, 2025.

Respectfully submitted,

/s/ Jeffrey L. Ertel
JEFFREY L. ERTEL
Ga. Bar No. 249966

**THE MENDELSOHN ERTEL LAW GROUP, LLC**
101 Marietta Street, NW
Suite 3325
Atlanta, GA 30303
(404)885-8878
(fax) (470) 826-1755
jeffrey@tmelg.com

Lisa Ivey
Stubbs, Sills & Frey, P.C.
1724 South Quintard Ave.
P.O. Box 2023
Anniston, AL 36202-2023
((256) 835-5050
(fax) (256) 835-0011
lisa@stubbssillsfrey.com

COUNSEL FOR MR. SPANEVELO

13

CERTIFICATE OF SERVICE

I certify that the foregoing was electronically filed using the Court's ECF system which automatically electronically serves a copy to counsel for the Government.

Dated, this the 8th day of December 2025.

/s/Jeffrey L. Ertel