## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **No. 4:23-cr-0021-CLM-SGC** |
| | § | **(redacted)** |
| **MARCUS SPANEVELO** | § | |
| | § | |

## REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION TO STRIKE ITS NOTICE OF ITS INTENT TO SEEK THE DEATH PENALTY

Marcus Spanevelo submits this reply to the Government's Response in Opposition to the Motion to Strike the Government's Notice of Intent to Seek the Death Penalty (ECF No. 100) (hereafter "Government's Response").

## I. Introduction

Before addressing the legal arguments made by the government, Mr. Spanevelo highlights what the government's response has *not* meaningfully disputed:

> • The factual assertions in the original declarations of Kevin Roberts, Lisa Ivey, Kelly Hart, and Jeffrey Ertel attached as exhibits to the motion to strike – including (1) that after the government's filing of its no-seek notice in February 2023, both this Court and the defense team relied on that formal notice by treating this case as a *non-capital* prosecution; and (2) that two potential mitigation witnesses (Mr. Spanevelo's father and his ex-girlfriend) have become permanently unavailable to the defense as the result of delay

between the government's no-seek notice and its subsequent notice of its intent to seek the death penalty;[1]

• The fact that, if the defense had known between the time of the no-seek notice and change of administrations in January 2025 that the government would file a notice to seek the death penalty after the change in administrations, Mr. Spanevelo's counsel would have vigorously pursued a resolution of the charges that would have foreclosed the death penalty;

 • The specific, detailed recommendations of the ABA's 2003 and 2008 guidelines for defense counsel in death penalty cases; and

• The express endorsement of those ABA guidelines by the Judicial Conference of the U.S. Courts.

Although not raising a factual dispute, the government does contest Mr. Spanevelo's characterization of the new "regime" that would result from this Court's acceptance of the government's legal position about its supposed unbridled authority to seek the death penalty after previously filing a formal no-seek notice 951 days before. *See* Government's Response, at 2-3. The government contends that its position, if adopted, would not create a new regime effectively requiring district courts to continue the appointment of two counsel (including one "learned counsel"), a mitigation specialist, and capital defense experts after a no-seek notice until the point when a defendant is actually convicted (thereby depriving the government of

---

[1] The closest that the government has come to genuinely disputing those facts is its dismissive treatment of the declarations' discussions of the prejudice suffered by Mr. Spanevelo resulting from the government's attempted reversal of its no-seek notice. Government's Response, at 21-26. The government's arguments are addressed *infra*.

its ability to seek the death penalty under 18 U.S.C. § 3593(a)).  Government's Response, at 2-3, 34.

The government is wrong.  If a no-seek notice has no legal effect and thus always can be withdrawn by the Department of Justice based on a mere "policy" or "political" change,[2] district courts, in order to implement 18 U.S.C. § 3005 and related Judicial Conference policy, will need to continue to treat every federal murder case as a potential death penalty case (until a conviction actually occurs before a formal notice to seek the death penalty has been filed).

In its attempt to address the practical effect of the government's position with respect to § 3005 (and related Judicial Conference policy), the government argues:

> When a defendant is charged with a capital crime, he may request that the court appoint learned counsel under § 3005.  But the court is not, at that juncture, required to fully fund a defense effort to prepare the sort of mitigation case it would present to a jury in a capital trial, and nothing in §§ 3005 or 3599 is to the contrary. The "multiple time-consuming and costly obligations" the defense complains about (Dkt. 99, at 46), e.g., funding for experts, mitigation specialists, etc., could more profitably await the filing of a death notice under § 3593, when it becomes clear the case will proceed to capital trial.

Government's Response, at 34.  Thus, the government contends, after a no-seek notice, a district court need not treat the case as if the government were still

---

[2] In its response, the government repeatedly admits that the sole reason that it has changed its mind in Mr. Spanevelo's case is the new administration's "policy" or "political" change about the death penalty – as opposed to being based on any evidence.  *See* Government's Response, at 29-30, 44, 49.

considering the death penalty unless the government changes its mind and files a notice of its intent to seek the death penalty.

That position conflicts with 18 U.S.C. § 3005,[3] which requires district courts to treat a case where the death penalty *could be sought* as an actual death penalty case with respect to the appointment of two counsel (including one "learned" counsel). If a no-seek notice does nothing to prevent the government's reconsideration of its position on the death penalty at any future date, then district courts would be required to continue to treat a federal murder case with the potential of the death penalty being sought as one subject to § 3005 and the related Judicial

---

[3] The plain language of that statute provides that: "*Whoever is indicted for [a] . . . capital crime* shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases . . . ." 18 U.S.C. § 3005 (emphasis added). Section 3005 does not say that the government must file a notice that it will be seeking the death penalty under 18 U.S.C. § 3593(a) before the requirement of the appointment of two counsel (including one learned counsel) exists. *See United States v. Cordova*, 806 F.3d 1085, 1099-1100 (D.C. Cir. 2015) (holding that only "after the government has *conclusively* determined that it will not seek the death penalty" and that the death penalty is not "on the table" and no longer a "possibility" are the requirements of § 3005 inapplicable) (emphasis added); *In re Sterling-Suarez*, 306 F.3d 1170, 1171-75 (1st Cir. 2002) (requiring district courts to "treat the case as capital from indictment forward, for purposes of appointing learned counsel, until it becomes clear that the death penalty is no longer an option"); *United States v. Dufur*, 648 F.2d 512, 515 (9th Cir. 1980) (holding § 3005 was inapplicable when the "death penalty was eliminated" as a possible punishment); *United States v. Shepherd*, 576 F.2d 719, 727–29 (7th Cir. 1978) (holding that because "there is *no possibility* that the death penalty can be imposed," § 3005 was inapplicable) (emphasis added); *United States v. Weddell*, 567 F.2d 767, 770-71 (8th Cir. 1977) (holding § 3005 was inapplicable when the charge "lost its capital nature" and the death penalty was "precluded").

The Eleventh Circuit cited *Sheperd* and *Wendell* (and similar cases in other circuits) with approval in *United States v. Grimes*, 142 F.3d 1342, 1347 (11th Cir. 1998). If the government were free to reconsider its prior no-seek notice for any reason (before the defendant is convicted), then the death penalty necessarily remains a possible option in the future – and § 3005 thus applies.

Conference policy (recommending the appointment of a mitigation specialist and mental health experts along with learned counsel). As a result, inordinate public resources would be wasted in those cases in which the government did not reconsider a no-seek notice before a defendant was convicted (which would preclude the death penalty at that juncture). Therefore, this Court should "not give its imprimatur to the creation of an entirely new regime for the administration of the death penalty that ignores longstanding norms and practices." *United States v. Constanza-Galdomez*, 787 F. Supp.3d 131, 136 (D. Md. 2025) (internal quotation marks omitted).

## II.  <u>Arguments in Reply</u>

### A. The Government's Notice of Its Intent to Seek the Death Penalty – After Filing a No-Seek Notice 951 Days Earlier – Was Not a "Prosecutorial Charging Decision."

Before addressing some of the specific contentions made by the government, Mr. Spanevelo first addresses a broader argument appearing throughout the government's response – that the government's October 5, 2025 notice (after filing its no-seek notice 951 days earlier) was simply an unreviewable act of "prosecutorial discretion" to make "*charging* decisions." Government's Response, at 2, 10, 14, 15-16, 19, 24, 28, 38, and 47-48 (emphasis added). That characterization is fundamentally inaccurate. This is not a case about prosecutorial discretion to bring new or different charges.

In early 2023, the government exercised its prosecutorial discretion to bring charges in the original indictment that Mr. Spanevelo caused the death of another person during the course of a kidnapping. The government then affirmatively stated that it would not be seeking the death penalty concerning that charge in its formal no-seek notice. Two-and-one-half years later, the government filed a superseding indictment that added "special findings" that are statutorily-required to seek the death penalty and also filed the statutorily-required notice of its intent to seek the death penalty – but did not add any new "charges." Instead, the government's actions in the fall of 2025 merely attempted to comply with 18 U.S.C. §§ 3591 & 3593 in order to seek an increased *sentence* for the *existing* charge. As discussed below, this Court should not treat that action as an unreviewable act of prosecutorial "charging" discretion. *See Constanza-Galdomez*, 787 F. Supp.3d at 142 ("The government contends that its newfound intent to seek the death penalty should be treated like any other superseding charging document. That is not a serious position.").

### B. The Government's October 5, 2025 Notice of Its Intent to Seek the Death Penalty Was Unauthorized Under 18 U.S.C. § 3593(a).

The government contends that Mr. Spanevelo's three alternative arguments based on 18 U.S.C. § 3593(a) – (1) that § 3593(a) does not, under any circumstances, permit the government to seek the death penalty after it has filed a formal no-seek

notice; (2) that, assuming *arguendo* § 3593(a) does in some cases, the government lacks "good cause" for withdrawing its no-seek notice in Mr. Spanevelo's case; and (3) in any event, the government's October 5, 2025 notice in Mr. Spanevelo's case was untimely under § 3593(a)  – lack merit.  *See* Government's Response, at 9-34. The government errs.

### 1.  Section 3593(a) Applies to the Government's Attempt to Withdraw Its No-Seek Notice.

The government contends that § 3593(a) does not, under any circumstances, prohibit it from seeking the death penalty after filing a formal no-seek notice and, instead, that § 3593(a) only applies insofar as it requires a timely notice of its intent to seek the death penalty and "good cause" to later amend such a notice. The government's argument is contrary to the rulings of every court to have decided the issue to date.  Such courts have held either that the filing of a no-seek notice is irrevocable or that at least a no-seek notice can be withdrawn only for "good cause." *United States v. Suarez*, 801 F. Supp.3d 872, 878 (N.D. Cal. 2025) (holding that the Government's decision not to seek the death penalty is "irrevocable"); *United States v. Constanza-Galdomez*, 787 F. Supp.3d 131, 146-47 (D. Md. 2025) ("The government insists that the statute does not say anything about a new death notice, even if a change in position [from a prior no-seek notice], and that the government is not required to have good cause to entirely change its mind. . . .  [T]he purpose of Section 3593(a) is to ensure that the government can only change its mind regarding

a death notice when there is good cause to do so. If Congress is concerned by the lesser [issue of amending the notice concerning aggravating factors], surely it would also be concerned with the greater. This Court agrees with Defendants that the principles Congress outlined in Section 3593(a) apply equally to this case."); *United States v. Spurlock*, 782 F. Supp.3d 987, 1008 (D. Nev. 2025) (same); *United States v. Dangleben*, No. 23-cr-0072, 2025 WL 2647195, at *6 (D.V.I. Sept. 15, 2025) (same), *on government's appeal* (3d Cir., No. 25-2807); *United States v. Cole & Smith*, 799 F. Supp.3d 438, 456 (D.V.I. Sept. 7, 2025) (same).[4]

At the very least, considering both Congress' clear purpose in not only § 3593(a) but also the clearly related provision in § 3005,[5] this Court should interpret § 3593(a) to require "good cause" for the government to withdraw a no-seek notice. *See United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543 (1940) ("[E]ven when the plain meaning did not produce absurd results but merely an unreasonable one plainly at variance with the policy of the legislation as a whole this Court has

---

[4] The government appears to argue that each of those cases is distinguishable from Mr. Spanevelo's case because the courts held that the government's notices of intent to seek the death penalty were not filed in a "reasonable time" before the existing trial dates in those cases (while there is no existing trial date in Mr. Spanevelo's case). *See* Government's Response, at 3. The government fails to acknowledge the fact that in each of those other cases the courts *alternatively* held that a no-seek notice is "irrevocable" or at least that "good cause" is required to withdraw a no-seek notice. That is, Mr. Spanevelo's motion to strike would be granted under the alternative holdings of each of those cases.

[5] Congress enacted both § 3593(a) and the current version of § 3005 in the same 1994 legislation. *See* Pub. L. 103-322, Title VI ("Death Penalty"), Sept. 13, 1994, 108 Stat. 1982.

followed that purpose, rather than the literal words.") (citation and internal quotation marks omitted).

Here, the government clearly cannot show "good cause." It seeks a reversal in its position about the death penalty solely based on an admitted "policy" or "political" change in the Department of Justice about the criteria for seeking the death penalty. Government's Response, at 29-30, 44, 49. Such a change does not constitute "good cause" to abandon a formally announced position of the prior administration – whose decisions are attributed to the current administration.[6] As the court in *Constanza-Galdomez* stated:

> The government does not hide the ball here – the only reason for its flip-flop on the death penalty was the change in administration. The government could have included death-eligible counts in the indictment and sought the death penalty from the beginning of this case. It did not. Nothing has changed other than the government's view on the death penalty. . . . The government contends that its newfound intent to seek the death penalty should be treated like any other superseding charging document. That is not a serious position. . . . The government asks this Court to treat its belated attempt to seek the death penalty like any other change in a charging document. This Court will not cast aside decades of law, professional standards, and norms to accommodate the government's pursuit of its agenda. Of course, elections have consequences, and this administration is entitled to pursue the death

---

[6] *See Giglio v. United States*, 405 U.S. 150, 154 (1972); *Santobello v. New York*, 404 U.S. 257, 262 (1971); *United States v. Carter*, 454 F.2d 426, 427-28 (4th Cir. 1972) (en banc); *cf. Newman v. Graddick*, 740 F.2d 1513, 1517-18 (11th Cir. 1984) ("Governor James and Commissioner Hopper were parties to this lawsuit when the agreement was signed and were the [then-]current officials of the state. Since they were the current officials and the parties, they had the authority to sign the consent decree, and to bind the incoming officials. The successor state officials, upon taking office, became parties to this suit and to the consent decree through automatic substitution and stand in the shoes of their predecessors.").

penalty in cases where it can do so in accordance with constitutional and statutory requirements. But this is not one of them.

*Constanza-Galdomez*, 787 F. Supp.3d at 142, 146. In addition, the court stated:

> Here, the government did not have good cause. The government does not even try to argue it was diligent, or that it had some legitimate reason for seeking the death penalty so late and contravening its own [prior] express statements. Rather, it argues it should not have to honor its representation that it would not seek the death penalty because it was not the product of an agreement. . . . The government possesses no special authority to go back on its word to a court. If anything, the government's special position comes with the obligation to "turn square corners in dealing with the people." *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 24 (2020). To say to these Defendants, whose lives are at stake, "'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government." *Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir. 1970).

*Id.* at 147.[7]

---

[7] To the extent that a "good cause" analysis looks at the government's "diligence" in announcing its intent to seek the death penalty, the focus on that inquiry should be on when the government had a factual and legal basis to seek the death penalty. *United States v. Le*, 316 F. Supp.2d 343, 347-51, *on rehearing*, 326 F. Supp.2d 739, 741 (E.D. Va. 2004). The government's decision after over two-and-one-half years to announce its intent to seek the death penalty – especially after initially formally disclaiming its intent to seek the death penalty – cannot be deemed "diligent" under any reasonable definition of that term.

In addition, any good-cause analysis when human life is at stake certainly should factor in whether the party asserting good cause for a change in its formal position in litigation has caused any prejudice to the other party (resulting from the other party's detrimental reliance). *Cf. Coale v. Metro-North R.R. Co.*, No. 08-cv-1307, 2009 WL 4881077, at *3 (D. Conn. Dec. 11, 2009) (finding good cause for an amendment to a civil complaint because it would cause no prejudice to the opposing party). If lack of prejudice to the opposing party is required to amend a civil pleading seeking money damages, it surely should be required to amend a notice concerning the government's intent to seek capital punishment. As explained in Mr. Spanevelo's motion to strike, he detrimentally relied on the government's no-seek notice and would be prejudiced if the government were permitted to seek the death penalty now.

Alternatively, assuming *arguendo* that the statute does not categorically prohibit such a diametric change in position or even require a showing of good cause, this Court should adopt a procedural rule under its supervisory authority that prohibits the government from diametrically changing its position, particularly when a defendant has detrimentally relied on the government's no-seek notice (as Mr. Spanevelo clearly has done). The government does not (and cannot) dispute a federal court's authority to create a procedural rule pursuant to its supervisory authority, but instead erroneously contends that Mr. Spanevelo has proposed a "substantive" – as opposed to a "procedural" – rule. *See* Government's Response, at 15. The proposed "supervisory authority" rule is not "substantive." Instead, Mr. Spanevelo proposes a procedure whereby the government's failure to comply with it has case-related consequences – just like other "supervisory authority" procedural rules, such as the procedural rule requiring prompt presentation of an arrested defendant before a judicial officer, the noncompliance with which by the government results in suppression of a confession (and potential dismissal of the charges). *See Corley v. United States*, 556 U.S. 303 (2009) (reaffirming the "*McNabb-Mallory* rule," a product of the Supreme Court's supervisory authority).

## 2. The October 5, 2025 Notice Was Untimely.

The government argues that Mr. Spanevelo's motion is foreclosed by the Eleventh Circuit's decision in *United States v. Wilk*, 452 F.3d 1208 (11th Cir. 2006),

because (1) this Court can set a death penalty trial date far enough in the future to permit the defense to prepare for such a trial, and (2) Mr. Spanevelo has not been unduly prejudiced by the government's change in position about the death penalty. *See* Government's Response, at 16-34.  The government is wrong in several ways.

First, as Mr. Spanevelo explained in his motion to strike, *Wilk* does not foreclose his argument that no trial date, no matter how far away in the future, will be "reasonable" under § 3593(a) in view of the circumstances of this case.  *Wilks* did not involve detrimental reliance by the capital defendant on the no-seek notice, and a continuance thus was deemed sufficient to avoid undue prejudice to the defendant. Conversely, no matter how much time that Mr. Spanevelo's defense team is given to prepare for a future death penalty trial, there will be irreparable prejudice to Mr. Spanevelo based on his detrimental reliance upon the government's no-seek notice.

Second, the government erroneously argues that detrimental reliance and prejudice are only relevant in this Court's analysis if Mr. Spanevelo can prove "bad faith" by the government in its change in position about the death penalty. Government's Response, at 18-21.  As the Eleventh Circuit has held, a defendant challenging the timeliness of the government's § 3593(a) notice need not show "bad faith" by the government.[8]  Instead, the timeliness standard under § 3593(a) is an

---

[8] *See Wilk*, 452 F.3d at 1223 n.26 ("The proper approach is to focus on whether the Death Notice reasonably gave the defendant adequate time before trial to prepare a defense, not whether the government reasonably should have made a decision earlier than it did.  In addition, there is no

"objective" standard that looks at whether the timing of the government's notice has impaired the defendant's ability to defend against the government's attempt to seek the death penalty. *See Wilk*, 452 F.3d at 1222-23 & n.26. Surely, if a defendant has detrimentally relied on the government's prior no-seek notice and has been irreparably prejudiced in relation to *any* trial date, no matter how far away it may be, the government cannot satisfy § 3593(a)'s objective standard.

Third, the government erroneously contends that any prejudice related to the 951 days of delay is mostly self-inflicted because Mr. Spanevelo's five motions for continuance filed after the no-seek notice accounted for 733 of the 951 days between the no-seek notice and the government's October 5, 2025 notice. Government Response, at 2, 20. The government fails to mention that, when the motions were filed, the defense had been led to believe that the death penalty was not a threat and, thus, had no reason to believe that the delays occasioned by the continuances would cause prejudice to Mr. Spanevelo's ability to defend against the death penalty in the future. The prejudice to Mr. Spanevelo resulting from those 733 days of delay cannot be deemed as self-inflicted when the government clearly led his defense counsel to believe that the death penalty was permanently off the table – particularly considering that the Department of Justice had never before attempted to withdraw

---

allegation in this case that the government actually made a decision but then in bad faith intentionally delayed advising Wilk of its decision in order to shorten Wilk's preparation time.").

a pretrial no-seek notice and replace it with a pretrial notice of its intent to seek the death penalty.[9]  The defense had absolutely no reason after the no-seek notice in early 2023 to prepare for a death penalty trial (including by going to Brazil to interview Mr. Spanevelo's family members there).  Furthermore, there was no learned counsel or mitigation specialist who could have done so.  The 951 days of delay – and the prejudice resulting therefrom – are solely attributable to the government.

Fourth, the government errs by claiming that Mr. Spanevelo has not demonstrated detrimental reliance and irreparable prejudice.  Contrary to the government's claim, he has not merely made "vague and speculative claims" about the loss in potential mitigation caused by the death of his father shortly after the government's October 5, 2025 notice.  Government's Response, at 21.  The original

---

[9] The government cites *United States v. Peoples*, 360 F.3d 892, 896 (8th Cir. 2004), as a supposed example of a case in which government was permitted to reverse its position after filing a no-seek notice.  *See* Government's Response, at 38 (citing *Peoples* as supposedly "recognizing the government's authority to pursue the death penalty on a retrial after abandoning the effort in the initial proceeding").  *Peoples* does not stand for the general proposition that the government may change its position after filing a no-seek notice for at least three reasons.  First, the only legal issue litigated in *Peoples* was a double jeopardy issue – not any of the legal issues raised in the instant case.  Second, there was no detrimental reliance by the defendant in *Peoples*.  Indeed, the government withdrew its death penalty notice *during the capital sentencing hearing* after a separate capital jury was unable to reach a verdict in a codefendant's case, resulting in an automatic life sentence for a codefendant deemed more culpable than Peoples by the prosecution.  *Peoples*, 360 F.2d at 894; *see also* Brief of Appellee, *United States v. Peoples*, No. 03-1207, 2003 WL 23062888, at *1, *8 (filed March 2003) (discussing the prosecution's decision to withdraw its notice to seek the death penalty against Peoples).  Third, the government only filed a second notice to seek the death penalty after the defendant (Peoples) and his codefendant (Lightfoot) had successfully appealed and obtained a reversal of their capital murder convictions (and life sentences) – thus effectively resetting the case.  *Peoples*, 360 F.2d at 894.

declarations of Kelly Hart and Susan Garvey, which were made part of Mr.

Spanevelo's motion to strike, explain why the death of Mr. Spanevelo's father is

prejudicial.

The government's arguments about Mr. Spanevelo's deceased father are

problematic in three different ways. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

[10] ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

In any event, the government clearly misunderstands the valuable source of mitigation that Mr. Spanevelo's deceased father could have provided. As Susan Garvey explains:

> [Mr. Spanevelo's father's] importance does not depend simply on the time he spent with his son; [his father's] own history as well as his [father's] family's is critical information relevant to mitigation. As I previously noted, interviewing immediate family members and investigating a client's family going back at least three generations is the accepted standard of practice in capital defense. This is so because familial patterns of abuse, family scripts, migration history and environmental factors – such as racism and poverty – define a family's ecosystem and illuminate the nature and nurture factors that shaped a client's life.

> Collecting data and records from family members about their own mental health struggles, disorders, or diseases is also a critical component of a thorough mitigation investigation. Children who inherit genetic vulnerabilities are particularly susceptible to developing signs and symptoms of major mental illness themselves. It is commonly accepted paradigm, supported by science, that mental illness runs in families.

> . . . [T]he government's position discounts what [Mr. Spanevelo's father] might have been able to report as to Mr. Spanevelo's infancy and early development. The chaos of many capital clients' lives in their early childhood is a potential cause of damage to the developing brain. [Mr. Spanevelo's father] was present for the first eighteen months of his life and thus uniquely positioned to report on how Mr. Spanevelo behaved in his infancy and, importantly, the care or lack thereof his mother provided.

**Exhibit B** (supplementary declaration of Susan Garvey, ¶¶ 2-4).

The government also asserts:

Defendant fails to explain why his investigator, who visited Brazil in June 2025, did not interview his father given her belief that "capital

clients' parents are usually the most important source of mitigation about the clients." Dkt. 99 at 26. She notes Defendant's father lived about 1044 miles from the city she chose to visit, Rio de Janeiro. *Id.* But despite seven days in Brazil, she could not find time for a two-hour flight to interview a witness the defense now characterizes as critical. *See Id.* More to the point, Defendant offers no explanation why an investigator could not have simply phoned this allegedly important witness.

Government's Response, at 22.

This argument fails to appreciate the practical difficulties of serving as a mitigation specialist in a foreign country with an entirely different language and culture and also does not account for the particular difficulties facing Mr. Spanevelo's mitigation specialist during her initial trip to Brazil. As Kelly Hart explains in her supplemental declaration:

> Traveling to Brazil for the first time was a daunting experience for me, especially since I was traveling alone to a country where I was unfamiliar with the culture and did not speak the language. To prepare for my trip, I conducted extensive research to familiarize myself with the region, particularly focusing on Mr. Spanevelo's family residing in and around Rio de Janeiro. This was my top priority, as I aimed to understand the local culture of where Mr. Spanevelo grew up, while also connecting with relatives I had never met. Navigating the sprawling landscape of Rio and its outskirts proved to be a time-consuming endeavor; reaching a single family member could take over an hour due to the city's vastness. Additionally, I had the opportunity to interview Mr. Spanevelo's mother, who traveled to Rio specifically to meet with me, necessitating multiple sessions to gather what I needed. The interviews themselves were lengthy, primarily due to the language barrier, which required the assistance of an interpreter. Given the constraints of my schedule, traveling to other parts of Brazil would have consumed precious time, potentially jeopardizing the important interviews in Rio that I had already arranged.

A seasoned investigator understands that relying on a phone call for a crucial interview is far from ideal.  In many cases, you may only have a single opportunity to engage with a key witness, and Mr. Spanevelo's father, Roberto, was not someone I was willing to approach via a phone call. Given that no one had communicated with him in years, there was a significant risk that he might decline my request for an interview altogether, as some of Mr. Spanevelo's family members informed me that Roberto Spanevelo had become a recluse and may not wish to talk with me, making the likelihood of him doing so over the phone even greater.  While I had no reason to anticipate hostility from him, I was acutely aware that he could simply refuse to engage. It is much easier to disconnect a call than to confront someone face-to-face and shut the door on them. Additionally, I needed to gather crucial information about Roberto's role within the family and gain further insights into his character as a father. The interviews that I had scheduled in Rio were prioritized so that I could learn more about Roberto's history that he shared with Marcus's mother, Lu, before reaching out to him. Part of my job as an investigator is to learn more about an important witness, prior to engaging with them. Flying to another part of Brazil to meet with Roberto directly would have taken up a significant part of the relatively little time that I had in Rio to learn more about him before approaching him. . . .

Because I assumed that Roberto Spanevelo would be available when I returned to Brazil for a future mitigation trip, I did not believe it was necessary to travel to see him during my first trip.  I had no information during my first trip that he was in poor health and, thus, had no reason to prioritize visiting him during my initial trip.

**Exhibit C** (supplemental declaration of Kelly Hart, ¶¶ 2-3, 6).

Susan Garvey adds:

In attempting to fault counsel and Ms. Hart for failing to interview [Mr. Spanevelo's father] before he died, the government evidences a misunderstanding of the role mitigation specialists play in a capital case and the professional norms they abide by in conducting an investigation.  At a bare minimum, mitigation specialists meet regularly and often with a client's immediate family members.  They play an indispensable role in identifying and developing evidence documenting the client's life trajectory, part of which necessarily means talking to as many available family as possible. . . .  The information gathering-skills

referenced includes conducting interviews with immediate family members face-to-face. Ms. Hart is correct that undertaking a mitigation interview with a critical witness on the phone does not comport with the standard of care for all the reasons she states and then some. Delicate information will not be disclosed to strangers over the phones; full disclosure requires time and patience and in-person meetings. The government's contention, therefore, that Ms. Hart should have called [Mr. Spanevelo's father] is without merit and unsupported by professional norms.

**Exhibit B** (supplementary declaration of Susan Garvey, ¶¶ 5-6).

The government further errs in attempting to belittle the lost opportunities – resulting from the 951-day delay in this case – to interview Mr. Spanevelo's ex-girlfriend and to observe Mr. Spanevelo's mental health when he was initially arrested and brought into federal custody. As Susan Garvey explains:

Mental health signs and symptoms are frequently ephemeral and they wax and wane depending on situations and environments. So yes, counsel can, moving forward, observe and document Mr. Spanevelo's presentation, but that does not make up for the two years when this did not occur by virtue of the government's decision not to seek the death penalty. Nor can whatever evidence that might be developed operate as a substitute for what may have been captured contemporaneously as to Mr. Spanevelo's behavior and functioning upon arrest and in the ensuing two years.

The same goes for the lost chance to interview Mr. Spanevelo's girlfriend around the time of his arrest for potential mitigation themes. She could have provided critical evidence regarding his mental state in and around the time of the crime. She may not have corroborated a mental state defense, but impaired capacity in and around the time of the crime is a mitigation theme jurors endorse as a reason to accord mercy.

**Exhibit B** (supplementary declaration of Susan Garvey, ¶¶ 8-9).

For all these reasons, the government has failed to effectively counter Mr. Spanevelo's strong showing of *actual* prejudice that he has suffered as a result of his defense's detrimental reliance on the government's no-seek notice. Such actual prejudice is in addition to the *presumptive* prejudice that must be assumed to have occurred over the lengthy period between its February 27, 2023 no-seek notice and the government's October 5, 2025 notice of its intent to seek the death penalty. *See United States v. Merrell*, No. 20-cr-046-1, 2025 WL 2911170, at *2 (N.D. W. Va. Oct. 7, 2025) ("Defendant's legal team rightly altered its preparation in light of [the government's no-seek] [n]otice, and now would be required to change course again if the Government is permitted to seek the death penalty. *But the real damage is to what the Defendant's legal team cannot get back*, which is investigation and other preparation that would have occurred closer in time to the alleged events and without the damage delay brings to an investigation.") (emphasis added).

## C. The Government Both Waived, and Is Estopped from Asserting, Its Ability to Seek the Death Penalty.

The government disputes Mr. Spanevelo's related but distinct arguments that the government both has *waived* its ability to seek the death penalty and also is *estopped* from seeking it – based on its no-seek notice. Government's Response, at 37-46. The government's arguments against waiver and estoppel lack merit. Whether under waiver or estoppel principles, the government's formal no-seek

notice was irrevocable – particularly after Mr. Spanevelo detrimentally relied on that formal no-seek notice.

### 1. Waiver

The government's ability to seek *enhanced penalties* for an *existing charge* is subject to waiver by the government (even if its decision of what *charges* to bring is generally not subject to judicial review).[11]  When it announced that it was not seeking the death penalty in connection with the charges in the indictment in a formal filing and waited 951 days to seek to change its mind, the government waived its right to seek the death penalty.

### 2. Estoppel

The government contends that the **judicial estoppel** doctrine is inapplicable because the government was not acting in a "proprietary" – as opposed to a

---

[11] It is well established that the government may waive its ability to seek an enhanced penalty. *See, e.g.*, *United States v. Ivy*, 83 F.3d 1266, 1296-98 (10th Cir. 1996) (holding that the government forfeited its right to invoke the otherwise applicable 20-year mandatory minimum penalty required by 21 U.S.C. §§ 841(b)(1)(A) & 851 by failing to object to the presentence report's erroneous statement that the defendant's mandatory minimum penalty was only 10 years, notwithstanding the government's timely pretrial filing of a § 851 information alleging the defendant's prior drug conviction as a basis for sentencing enhancement); *United States v. Tello*, 687 F.3d 785, 798-99 (7th Cir. 2012) ("[T]here was no legitimate reason for the government to ignore the accessory-after-the-fact guideline at the time of Hill's first sentencing, and its failure to do so resulted in a waiver of its arguments as to [an increased sentence under] that guideline."); *United States v. Petite*, 703 F.3d 1290, 1292 n.2 (11th Cir. 2013) ("The government cannot offer for the first time on appeal a new predicate conviction in support of an enhanced ACCA sentence [that is set forth in the presentence report]. The argument should have been made prior to or during sentencing, allowing Petite the opportunity to object and offering the sentencing court an opportunity to fairly consider the issue in the first instance."), *overruled on other grounds by Johnson v. United States*, 576 U.S. 591 (2005).

"sovereign" – capacity when it filed its no-seek notice.  Government's Response, at 41-42 (citing *United States v. Killough*, 848 F.2d 1523, 1526 (11th Cir. 1988), and *Cox v. Kurt's Marine Diesel of Tampa, Inc.*, 785 F.2d 935, 936 (11th Cir. 1985)). The government's reliance on those cases is clearly misplaced.  Those cases did not involve the doctrine of judicial estoppel.  Instead, they involved estoppel-based claims for money damages against the government.  *Killough*, 848 F.2d at 1526; *Cox*, 785 F.2d at 936.  The "proprietary" limitation to an estoppel claim makes sense when the federal treasury is implicated.  However, it is irrelevant with respect to the judicial estoppel doctrine.  Just as other courts have done, this Court should hold that the judicial estoppel doctrine prevents the government from seeking the death penalty after filing a formal no-seek notice 951 days before.  *See Constanza-Galdomez*, 787 F. Supp.3d at 147-48; *Spurlock*, 782 F. Supp.3d at 1009.

The government next contends that the **equitable estoppel** doctrine does not apply because Mr. Spanevelo has not demonstrated "affirmative misconduct" by the government.  Government's Response, at 43.  Again, the government errs. Regarding equitable estoppel being applied against the government, the Supreme Court has stated:

> Though the arguments the Government advances for the [*per se*] rule [against equitably estopping the government] are substantial, we are hesitant, when it is unnecessary to decide this case, to say that there are no cases in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the

countervailing interest of citizens in some minimum standard of
decency, honor, and reliability in their dealings with their Government.

*Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 60-
61 (1984).  What the government has done in this case is the polar opposite of
"decency, honor, and reliability" in its dealing with Mr. Spanevelo – in a case in
which the highest stakes are at issue (human life).  For that reason, this is an
appropriate case in which to apply the equitable estoppel doctrine.  In any event, the
government's "playing fast and loose"[12] by seeking to negate the no-seek notice
without even moving for leave of court and without showing "good cause" –
particularly when Mr. Spanevelo detrimentally relied on the no-seek notice –
qualifies as "affirmative misconduct" sufficient to estop the government under the
equitable estoppel doctrine.

    The government next contends that its February 2023 no-seek notice does not
qualify as a "promise" – an essential element of **promissory estoppel** – because the
no-seek notice was a unilateral statement not made in the context of bargaining
between the government and Mr. Spanevelo and also was not an "unambiguous"
guarantee that the government would not change its position in the future.  *See*
Government's Response, at 45-46.  The government is wrong.  A "promise" is "[t]he
manifestation of an intention to act or refrain from acting in a specified manner,

---

[12] *Constanza-Galdomez*, 787 F. Supp.3d at 148; *Spurlock*, 782 F. Supp.3d at 1013.

conveyed in such a way that another is justified in understanding that a commitment has been made." BLACK'S LAW DICTIONARY (10th ed. 2014). The February 2023 no-seek notice was precisely that. It is irrelevant that the promise was made unilaterally and not in the context of "bargaining" that failed to achieve an enforcement contract. Indeed, a "unilateral" promise is a prerequisite for the promissory doctrine to apply. *See, e.g.*, *Owens v. Am. Refuse Sys., Inc*., 536 S.E.2d 782, 782 (Ga. App. 2000) ("Absent a unilateral promise, promissory estoppel does not apply.").

Finally, just as it did with respect to equitable estoppel, the government contends that the promissory estoppel doctrine does not apply against the government without a showing of "affirmative misconduct." Government's Response, at 45-46. As other courts have held, the government's attempt to renege on its prior no-seek notice without "good cause" and when Mr. Spanevelo has acted in detrimental reliance on the government's unilateral promise qualifies as "playing fast and loose" – which is sufficient affirmative misconduct to estop the government. *Constanza-Galdomez*, 787 F. Supp.3d at 148; *Spurlock*, 782 F. Supp.3d at 1013.

## D. Allowing the Government to Proceed on its Death Penalty Notice Would Violate the Fifth and Eighth Amendments.

The government makes similar meritless arguments with respect to Mr. Spanevelo's related due-process and cruel-and-unusual-punishment claims. *See* Government's Response, at 46-52.

24

Regarding the due process claim, the government falls back on its inaccurate characterization of the government as having exercised its prosecutorial discretion to bring different "charges." Government's Response, at 47-48. As discussed above, what the government has done concerns only *what punishment* that it seeks a jury to impose. And, for the reasons discussed in the motion to strike, the government's conduct qualifies as "arbitrary and capricious" and also "shocks the conscience." It thus violates due process.

Regarding the Eighth Amendment claim, the government argues that the motion to strike "offers no legal authority for the proposition that facing the possibility of the death penalty, following prior notice of the government's intent not to seek the death penalty, constitutes cruel and unusual punishment in the constitutional sense, much less a variety that would offend the Eighth Amendment." Government's Response, at 50. The government is correct only in one way – that Mr. Spanevelo can point to no prior judicial decision concluding that such conduct violates the Eighth Amendment. But that is for an obvious reason: the Department of Justice has never attempted to renege on a no-seek notice until 2025. In view of the government's unprecedented action, such a lack of precedent is hardly a reason not to find an Eighth Amendment violation.

As explained in the motion to strike, what the government seeks to do is both "cruel" and "unusual." Permitting the prosecution to obtain the death penalty under

these circumstances would inflict unnecessary and excessive punishment – inhumane psychological trauma[13] coupled with a death sentence. *See Baze v. Rees*, 553 U.S. 35, 96-97 & n.* (2008) (Thomas, J., concurring in judgment) (discussing the Framers' belief that "superadditions" – gratuitous forms of torture added to executions – were cruel and unusual punishment).

---

[13] *Cf. United States v. Green*, No. 12-CR-83S, 2018 WL 786185, at *11 (S.D.N.Y. 2018) (in dismissing an indictment on speedy trial grounds, the court noted among other factors the "unique anxiety and concern that comes with the looming prospect of the death-penalty, a prejudice not easily measurable and one absent in the majority of criminal cases"), *aff'd sub nom.*, *United States v. Black*, 918 F.3d 243, 265 (2d Cir. 2019) ("Black, Green, and Rodriguez were forced for two years and ten months to worry over whether the government would seek not just their liberty, but their lives. The magnitude of the anxiety and concern incurred by this decision is great, and this consideration weighs heavily in our determination that the delay here prejudiced Defendants-Appellees."). The government claims that *Green* and *Black* are irrelevant because they considered a Sixth Amendment speed trial issue. Government's Response, at 51. Although those cases addressed the Sixth Amendment, the courts' recognition of the "unique anxiety" that comes with waiting for the prosecution's decision about whether to seek the death penalty applies with even more force – under the Eighth Amendment – in a case in which the government originally announced it would *not* seek the death penalty and then, 951 days later, changed its position without any reason other than a change in "policy" in a new administration.

# CONCLUSION

For the foregoing reasons and for the reasons set forth in Mr. Spanevelo's motion to strike, this Court should strike the government's notice of its intent to seek the death penalty.

Respectfully submitted,

/s/ *Jeffrey Ertel*
Jeffrey Ertel
The Mendelsohn Ertel Law Group
101 Marietta Street, NW., Ste 3325
Suite 3325
Atlanta, GA 30303
404-885-8878
Email: jeffrey@tmelg.com

Lisa Marie Ivey
Stubbs Sills & Frye, PC
1724 South Quintard Avenue
PO Box 2023
Anniston, AL 36202-2023
256-835-5050
Fax: 256-835-0011
Email: lisa@stubbssillsfrye.com

Brent E. Newton
*Admitted Pro Hac Vice*
19 Treworthy Road
Gaithersburg, MD 20878
202-975-9105
Email: brentevannewton@gmail.com

**Counsel for Defendant**
**Marcus Spanevelo**

## <u>CERTIFICATE OF SERVICE</u>

On February 9, 2026, I served a copy of this sealed motion on lead counsel for the government, Walter Perkel, at <u>walter.perkel@usdoj.gov</u>. I also filed a redacted version of this motion via this Court's CM/ECF system, which served all counsel of record.

/s/ Jeffrey Ertel
Jeffrey Ertel